**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Guillermo Javier MEJIA, a/k/a Miguel; Jorge Ortega, Ramon Lopez, Defendants–Appellants.**

No. 91–6108.

United States Court of Appeals, Eleventh Circuit.

May 14, 1996.

Yolanda Morales, Coral Gables, FL, for Jorge Ortega.

Arthur Joel Berger, Miami, FL, for Guillermo Javier Mejia and Ramon Lopez.

Kendall Coffey, U.S. Attorney, Madeleine Shirley, Adalberto Jordan, Linda Collins Hertz, Asst. U.S. Attys., Miami, FL, for appellee.

Before EDMONDSON and DUBINA, Circuit Judges, and ENGEL *, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Guillermo Mejia, Jorge Ortega and Ramon Lopez appeal drug convictions. We affirm.

Jose Benitez, a confidential informant working under the supervision of Special Agent Paul Grimal, was placed on a boat going from Miami to Columbia, South America. Benitez was to gather intelligence on the Columbian drug trade and (if contacted by cocaine traffickers) to arrange to bring cocaine into the United States so that the distributors could be arrested. When Benitez's boat arrived at an island off the coast of Columbia, Benitez was notified that "Cesar" wanted him to smuggle some cocaine to the United States.

Benitez was taken to Cesar's home, where he met with Cesar, appellant Mejia, and a drug dealing Columbian policeman. Benitez and Mejia discussed the logistics of delivering the cocaine to Miami; they also agreed to meet at a bar near the Miami River docks once the drugs were successfully smuggled into the United States. After this conversation, Benitez returned to the boat; and the policeman later delivered to him over 5 kilos

---

* Honorable Albert J. Engel, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

of cocaine. The boat, Benitez, and the cocaine then made the return voyage to Miami.

A day after the boat docked in Miami, Benitez arrived at a local hotel for a pre-arranged meeting with Agent Grimal. Before finding Grimal, however, Benitez coincidentally ran into Mejia. As the two talked, appellant Lopez arrived. Mejia told Benitez that Benitez should deliver the cocaine to Lopez. Lopez and Benitez then discussed where the delivery should take place. Agent Grimal, at the hotel to meet with Benitez, observed all of this conduct.

Later, a rendezvous was set up at a restaurant. Benitez, wearing a hidden eavesdropping device provided by Agent Grimal, arrived at the restaurant and was met by Lopez. At the restaurant already was appellant Ortega, who had not met Benitez before. Codefendant Alameda arrived next. After going into the restaurant, Alameda returned to his car and picked up a transparent bag filled with cash. He then returned to the restaurant with the cash bag. Lopez instructed Ortega to go with Benitez to retrieve the cocaine; Ortega and Benitez left in Benitez's car. Lopez also left the restaurant and followed Benitez.

Ortega directed Benitez to their destination (a trailer park). During the trip, Ortega explained to Benitez that the cash had not been wrapped properly and told Benitez that "when you have something on you, you have to be very careful." Upon arrival at the trailer park, Ortega got out of the car; and Benitez handed him a briefcase containing drugs. Unknown to Defendants, drug agents had been observing this activity; agents arrested Ortega, Lopez, Alameda and, eventually, Mejia.

All four defendants were to be tried together. But, after opening statements, Alameda changed his plea to guilty and later testified for the government. Two defendants testified on their own behalf and offered innocent explanations for their misdeeds. Still, all were convicted of possession with intent to distribute cocaine and of conspiracy to do the same. On a variety of

grounds, each appeals his convictions. We affirm.

## I.

■ Each appellant argues that his statutory right to a speedy trial was violated. *See* 18 U.S.C. § 3161. The parties present many arguments on whether the Speedy Trial Act was violated. The district court concluded there was no violation of the Act; and, we may affirm on any ground that finds support in the record. *Jaffke v. Dunham,* 352 U.S. 280, 280, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957). In general, the burden is on the defendant to prove that a dismissal is appropriate. 18 U.S.C. § 3162(a)(2).

■ To have been timely, this trial must have started within 70 days of 20 June 1990, the day after the return of the relevant indictment. *See* 18 U.S.C. § 3161(c)(1); *see also, United States v. Vasser,* 916 F.2d 624, 626 (11th Cir.1990). But, days which are excludable under the Act are not counted against the 70 day limit. *See* 18 U.S.C. § 3161(h). And, in a multi-defendant case, time excluded due to one defendant results in excludable days for his codefendants. *See United States v. Sarro,* 742 F.2d 1286, 1299 (11th Cir.1984).

■ On 19 July 1990, Ortega filed nine pre-trial motions.[1] One of these motions was a request for an extension of time for filing further motions. By an order filed on 21 August 1990, the court gave Ortega until fifteen days before trial to prepare and to file pretrial motions. Under these circumstances, courts have concluded that the time given for filing potential pretrial motions is excluded under 18 U.S.C. § 3161(h)(1) because the time given is "delay resulting from other proceedings concerning the defendant." *See United States v. Tibboel,* 753 F.2d 608, 610 (7th Cir.1985); *United States v. Mobile Materials, Inc.,* 871 F.2d 902, 913–914 (10th Cir.1989); *United States v. Wilson,* 835 F.2d 1440, 1444–45 (D.C.Cir.1987); *United States v. Lewis,* 980 F.2d 555, 564 (9th Cir.1992); *United States v. Jodoin,* 672 F.2d 232, 237–

---

1. Time from the filing of a pretrial motion until the prompt disposition of that motion is excluded

under 18 U.S.C. § 3161(h)(1)(F).

38 (1st Cir.1982).[2] Whether motions are actually filed during the extension is unimportant. *United States v. Montoya,* 827 F.2d 143, 153 (7th Cir.1986).[3]

In this case, excluding the days between the filing of the motion for extension of time and the day which was 15 days before trial eliminates the possibility that the Speedy Trial Act was violated. (About 10 months passed between the order granting the extension and the 1 July 1991 motion to dismiss under the Speedy Trial Act.)[4] Where a defendant moves for an extension, he can perhaps limit the number of excludable days by limiting his request for extra time to a definite period. *See, e.g., Montoya,* 827 F.2d at 153. Or, the defendant can choose to ask for no extension. And, a defendant can object to an open-ended extension. But here no appellant contends that he objected to the open-ended extension granted at the request of Ortega.

In sum, under the circumstances, an order granting an extension of time for the preparing and the filing of pre-trial motions causes a delay for the purpose of the Speedy Trial Act: a delay resulting from a proceeding concerning the defendant. As such, the days between the order granting Ortega's motion for an extension and the day which was 15 days before trial are excluded under section 3161(h)(1). The Speedy Trial Act was not violated here.

## II.

■ Appellants argue that they were denied a fair trial by the government's failure to disclose before trial all inducements offered Benitez in exchange for his cooperation. *See generally Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court's conclusion that no *Brady* violation occurred is subject to *de novo* review. *See United States v. Beasley,* 72 F.3d 1518, 1525 (11th Cir.1996).

■ Defendants were informed that Benitez received $30,000 for his cooperation in this case. But, defendants say the government did not disclose that Benitez was permitted to take more than $10,000 out of the country without filing the required paperwork, was given free lodging during the course of the investigation, and failed to pay taxes on money given to him for his cooperation. And, the government did not disclose Benitez had previously been paid $16,000 for his work on other cases.

Accepting that the government suppressed the evidence and that the evidence is probative of Benitez's truthfulness, we conclude no reasonable probability exists that the outcome of this trial would have been different had the extra information been disclosed. *See Delap v. Dugger,* 890 F.2d 285, 298–99 (11th Cir.1989) (observing that a "reasonable probability" is one sufficient to undermine confidence in outcome). The government disclosed that Benitez was paid $30,000 for his work; the other information is cumulative. And, the information alleged to have been withheld was brought out in fact on

**2.** One difference between this case and these cited cases is that here the district judge granted an extension of time which ended 15 days before trial; the extension was not for a specific number of days. Where a defendant does not request a certain number of days and where no defendant objects to the kind of indefinite extension granted here, we think the difference—the difference between a definite and indefinite extension—commands no different result.

**3.** Because answering the question is not required in this case, we decide nothing today about whether extensions for the preparation and filing of pretrial motions granted by the court upon motion of the government or by the court *sua sponte* result in excludable days under § 3161(h)(1). *Compare United States v. Montoya,* 827 F.2d 143, 153 (7th Cir.1986) (where court *sua sponte* grants extension, time is excludable) *with United States v. Moran,* 998 F.2d 1368, 1370–71 (6th Cir.1993) (where court *sua sponte* grants extension, days are not excluded); *see also, United States v. Hoslett,* 998 F.2d 648, 660 (9th Cir.1993) (Kozinski, J. dissenting) (explaining why extensions granted by court order—whether upon motion of defendant, motion of government or *sua sponte*—should result in excludable days).

**4.** The Sixth Amendment's fundamental independent protection against undue delay is not controlled by this interpretation of the Speedy Trial Act. Although a constitutional argument was asserted in the district court, this argument has been abandoned on appeal because it is not raised in appellants' briefs.

cross examination of Benitez.[5]

## III.

Appellants argue the district court abused its discretion in refusing to give a jury instruction on entrapment. During deliberations, the jury sent a note to the judge indicating that some jurors believed "a crime was created, by the U.S. Government." The judge then refused a defense request for an entrapment instruction; instead, the court sent a note telling the jury to consider all the evidence in determining whether the Government proved guilt beyond a reasonable doubt and to follow his instructions on the law in determining whether the Government met its burden.

Appellants contend that failing to give the requested instruction "in essence directed a verdict." But, no defendant requested an instruction on entrapment before the note from the jury was sent to the judge. That "the extent and character of additional instructions is within the sound discretion of the trial court" is well settled. *United States v. Parr*, 716 F.2d 796, 808 (11th Cir.1983). It is also settled that the judge may sometimes simply refer the jury back to his earlier instructions. *United States v. Bailey*, 830 F.2d 156, 157 (11th Cir.1987). Given this record, the judge's response to the jury's question was no abuse of discretion.[6]

## IV.

Next, Appellants argue the district judge abused his discretion in failing to grant a mistrial based on Alameda's change in plea and later testimony. Alameda's lawyer gave an opening statement where he protested his client's innocence and maintained that, while Alameda may have been present at a crime,

he had no guilty knowledge. Counsel for Alameda's co-defendants offered similar theories in their openings.

But, before the introduction of evidence, Alameda—outside the presence of the jury—changed his plea in Count I to guilty. (He also pled guilty to charges in an unrelated matter.) The prosecution then announced it planned to call Alameda as a witness. This incident inspired Alameda's codefendants—again outside the presence of the jury—to move for a mistrial.

The trial judge denied the motion. When the jury returned, the judge reminded them that they had "not heard one shred of evidence" yet. The judge then told the jury that he had decided to remove Alameda from consideration. The government later called Alameda to testify; the defense again moved (this time at sidebar) for a mistrial. The motion was denied. After Alameda's testimony, the trial court instructed the jury that Alameda's opening statement was not evidence and should be disregarded. The judge further instructed the jury that because of the guilty plea, the jury should consider Alameda's testimony "with more caution." The judge also instructed the jury that Alameda's plea should be considered only for Alameda's credibility and should not be considered in determining the guilt of other defendants.

A mistrial is not required where a codefendant changes his plea in the middle of a trial if the jury is properly instructed and if evidence of the plea is properly limited. *See United States v. Griffin*, 778 F.2d 707, 710 n. 5 (11th Cir.1985) (dictum). And, where a codefendant pleads guilty and later testifies, evidence of the guilty plea may be

---

**5.** Our review of the record persuades us that each item of evidence now said to have been withheld in violation of *Brady* was revealed to the jury through cross examination of Benitez. Mejia appears to concede this fact, writing in his brief, "[i]t is no answer that the benefits given to Benitez by the government were ultimately revealed."

**6.** Before a defendant is entitled to an instruction on entrapment, he must first raise a jury issue about whether the government created a substantial risk that the offense had been committed

by one not disposed to do so. *United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir.1985).

Here, the theory of defense was never entrapment; instead, Defendants argued no drug offense was committed. We conclude insufficient evidence was presented which would create a jury question on entrapment. *See id.* (listing evidence which might create jury question and holding defendant failed to produce such evidence). As such, the judge adequately responded to the jury's note.

introduced to aid the jury in assessing the codefendant's credibility. *See id.* But, Defendants argue a mistrial is required where their codefendant offered a theory of defense identical to their own in opening statements, changed his plea, and then testified about his guilty plea and about his former codefendant's culpability.

Permitting testimony under these kind of circumstances might in some cases result in unfair prejudice. But under similar facts, other circuits have permitted a codefendant's testimony. *See United States v. Gambino,* 926 F.2d 1355, 1364 (3d Cir. 1991); *and United States v. Pierro,* 32 F.3d 611, 616–618 (1st Cir.1994) And, as discussed above, the district court in this case carefully instructed the jury. Chiefly because of these instructions, we conclude there was no abuse of discretion here when the motions for mistrial were denied.[7]

## V.

Ortega argues insufficient evidence exists to convict him. His contention is that the evidence proves his mere presence at a crime. *See, e.g., United States v. Hardy,* 895 F.2d 1331, 1335 (11th Cir.1990). Ortega was present at the restaurant where the delivery of drugs was discussed. He was instructed to (and did) go with Benitez to deliver the cocaine. He discussed the packaging of the money, telling Benitez that you have to be careful when you have something on you. And, he was holding cocaine when he was arrested.

Ortega took the stand in his own defense and offered innocent explanations for his conduct: he said he thought he was participating in a transaction to purchase a trailer, not a transaction to purchase cocaine. As explained recently in *United States v. Brown,* 53 F.3d 312, 314–15 (11th Cir.1995), a defendant's explanations at trial can actually increase the amount of evidence supporting a guilty verdict. *Id.; see also United States v. Zafiro,* 945 F.2d 881, 888 (7th Cir.1991). One reason we accept that a jury can treat a defendant's testimony—even if all the words deny wrongdoing—as proof of guilt is that the jury is uniquely able to evaluate the defendant's demeanor on the witness stand. *Brown,* 53 F.3d at 315; *see also Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992) (plurality opinion) (jury may disbelieve testimony based on demeanor and is "entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt").

In this case, the guilty verdict is contrary to Ortega's testimony.[8] Thus, we are forced to accept that the jury rejected the heart of Ortega's testimony. A proper inference the jury can make from disbelieved testimony is that the opposite of the testimony is true. *See Brown,* 53 F.3d at 314. Because this inference is permissible and because it is an inference which supports the verdict, we must conclude that, from Ortega's denials of guilty knowledge, the jury had before it evidence that Ortega knew full well he was involved in a drug transaction. Sufficient evidence existed for a reasonable juror to have found guilt beyond reasonable doubt.

The convictions in this case are AFFIRMED.

---

7. Defendant Ortega asserts another reason why Alameda's testimony requires a mistrial. Alameda testified that he knew Ortega from "past dealings." Ortega objected; the judge quickly struck this response and asked the jury to disregard it. But, Ortega asserts it was prosecutorial misconduct to elicit it. Alameda did not say that the "past dealings" were drug related (though the record is full of reference to "drug deals"). A matter withdrawn from the jury with a direction by the court that it be disregarded is no basis for reversal unless the matter was so highly prejudicial that it was incurable by the instruction. *See United States v. Adams,* 799 F.2d 665, 671 (11th Cir.1986). The instruction was enough. Alameda's utterance on "past dealings" is no grounds for a new trial.

8. Ortega was asked, "at any time were you aware that there was a cocaine deal going on?" and "did you ever conspire with any other people to commit a cocaine transaction?" He answered "no" to both questions.